IN THE UNITED STATES COURT OF FEDERAL CLAIMS


| | |
|---|---|
| CROW CREEK SIOUX TRIBE, | ) Case No. 1:16-cv-0760-JFM |
| | ) Hon. James F. Merow |
| Plaintiff, | ) |
| | ) (E-filed October 27, 2016) |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |
| | ) |


## UNITED STATES' MOTION TO DISMISS

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................... 2

II.    BACKGROUND ....................................................................................................... 3

    A.    Factual Background ....................................................................................... 3

    B.    Procedural Background.................................................................................. 6

III.    LEGAL STANDARDS ............................................................................................ 9

    A.    Rule 12(b)(1)................................................................................................. 9

    B.    A *Winters* Doctrine Right Reserves Water Necessary to Fulfill the Purpose of the Reservation. ................................................................................ 10

IV.    ARGUMENT .......................................................................................................... 12

    A.    The Six-Year Statute of Limitations, 28 U.S.C. § 2501, Bars Plaintiff's Claims. ....................................................................................................... 12

        1.    Plaintiff's Claims Accrued More than Six Years Before it Filed its Complaint........................................................................................... 14

        2.    The Continuing Claim Doctrine Does Not Toll the Six-Year Statute of Limitations................................................................................... 16

        3.    The Department of the Interior Appropriation Act Riders Do Not Render Plaintiff's Breach of Trust Claim Timely.................................... 19

    B.    Plaintiff Cannot Show Actual or Imminent Injury Stemming from Any Act of the United States.......................................................................................... 22

        1.    Plaintiff Lacks Standing to Pursue Its Claims. ......................................... 23

        2.    Alternatively, Plaintiff's Claims are Not Ripe......................................... 25

    C.    The Court Lacks Jurisdiction over Plaintiff's Breach of Trust Claim Because There Is No Money-Mandating Fiduciary Duty to Manage Missouri River Water.......................................................................................... 26

    D.    The Court Lacks Jurisdiction over Plaintiff's Accounting Claim. ....................... 31

    E.    The Court Lacks Jurisdiction over Plaintiff's Breach and Accounting Claims Because the United States Cannot Be Compelled to Quantify Water Rights. .......................................................................................................... 32

V.    CONCLUSION....................................................................................................... 35

# TABLE OF AUTHORITIES

<u>Cases</u>

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967).................................................................................. 26

*Am. Indians Residing on the Maricopa-Ak Chin Reservation v. United States,*
  667 F.2d 980 (Ct. Cl. 1981) ...................................................................... 31

*Anderson v. United States,*
  344 F.3d 1343 (Fed. Cir. 2003) ................................................................ 23

*Ariandne Fin. Servs. Pty. Ltd. v. United States,*
  133 F.3d 874 (Fed. Cir. 1998) .................................................................. 17

*Arizona v. California,*
  373 U.S. 546 (1963).................................................................................. 10

*Arizona v. California,*
  439 U.S. 419 (1979).................................................................................. 10

*Arizona v. California,*
  530 U.S. 392 (2000).................................................................................. 12

*Arizona v. San Carlos Apache Tribe of Ariz.,*
  463 U.S. 545 (1983).................................................................................. 35

*Bannum, Inc. v. United States,*
  115 Fed. Cl. 257 (2014) ............................................................................ 23

*Boling v. United States,*
  220 F.3d 1365 (Fed. Cir. 2000) .......................................................... 17, 18

*Brandt v. United States,*
  710 F.3d 1369 (Fed. Cir. 2013) ................................................................ 13

*Brown Park Estates-Fairfield Dev. Co. v. United States,*
  127 F.3d 1449 (Fed. Cir. 1997) .......................................................... 17, 19

*California v. United States,*
  235 F.2d 647 (9th Cir. 1956) .................................................................... 32

*Cappaert v. United States,*
  426 U.S. 128 (1976).................................................................................. 12

*Casitas Mun. Water Dist. v. United States,*
  708 F.3d 1340 (Fed. Cir. 2013) .......................................... 11, 12, 25, 26

*Colville Confederated Tribes v. Walton,*
  647 F.2d 42 (9th Cir. 1981) ...................................................................... 12

*Creek Nation v. United States,*
  318 U.S. 629 (1943).................................................................................. 33

*DaimlerChrysler Corp. v. United States*,
   442 F.3d 1313 (Fed. Cir. 2006) ................................................................... 9

*Dep't of the Army v. Blue Fox, Inc.*,
   525 U.S. 255 (1999) ................................................................................... 20

*Evans v. United States*,
   107 Fed. Cl. 442 (2012) ............................................................................. 31

*Fallini v. United States*,
   56 F.3d 1378 (Fed. Cir. 1995) ................................................................... 13

*FDIC v. Meyer*,
   510 U.S. 471 (1994) ................................................................................... 27

*Felter v. Norton*,
   412 F. Supp. 2d 118 (D.D.C. 2006) ........................................................... 18

*Fid. & Guar. Ins. Underwriters, Inc. v. United States*,
   805 F.3d 1082 (Fed. Cir. 2015) ................................................................. 13

*Fredericks v. United States*,
   125 Fed. Cl. 404 (2016) ............................................................................. 23

*Gros Ventre Tribe v. United States*,
   469 F.3d 801 (9th Cir. 2006) ..................................................................... 29

*Heckler v. Chaney*,
   470 U.S. 821 (1985) .............................................................................. 33, 34

*Henke v. United States*,
   60 F.3d 795 (Fed. Cir. 1995) .................................................................. 3, 10

*Hopi Tribe v. United States*,
   782 F.3d 662 (Fed. Cir. 2015) ................................................. 11, 27, 28, 29

*John v. United States*,
   247 F.3d 1032 (9th Cir. 2001) ................................................................... 11

*John v. United States*,
   720 F.3d 1214 (9th Cir. 2013) .............................................................. 11, 12

*Klamath & Modoc Tribes v. United States*,
   174 Ct. Cl. 483 (1966) ............................................................................... 32

*Land v. Dollar*,
   330 U.S. 731 (1947) ................................................................................... 10

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .............................................................................. 23, 25

*M. Maropakis Carpentry, Inc. v. United States*,
   609 F.3d 1323 (Fed. Cir. 2010) ................................................................. 10

*McNutt v. Gen. Motors Acceptance Corp.,*
  298 U.S. 178 (1936) ................................................................. 10

*Menominee Indian Tribe of Wisc. v. United States,*
  136 S. Ct. 750 (2015) ............................................................... 29

*Menominee Tribe of Indians v. United States,*
  726 F.2d 718 (Fed. Cir. 1984) ................................................. 13

*Mitchell v. United States,*
  10 Cl. Ct. 787 (1986) ............................................................... 18

*Mitchell v. United States,*
  13 Cl. Ct. 474 (1987) ............................................................... 13

*Moyer v. United States,*
  190 F.3d 1314 (Fed. Cir. 1999) ............................................... 10

*Muscogee (Creek) Nation of Okla. v. United States,*
  103 Fed. Cl. 210 (2011) ........................................................... 31

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,*
  538 U.S. 803 (2003) ................................................................. 25

*Nat'l Treasury Emps. Union v. United States,*
  101 F.3d 1423 (Fed. Cir. 1996) ............................................... 25

*Navajo Nation v. U.S. Dep't of the Interior,*
  34 F. Supp. 3d 1019 (D. Ariz. 2014) ...................................... 30

*Niagara Mohawk Power Corp. v. Fed. Power Comm'n,*
  202 F.2d 190 (D.C. Cir. 1952) ................................................ 11

*Palazzolo v. Rhode Island,*
  533 U.S. 606 (2001) ................................................................. 25

*Quapaw Tribe of Okla. v. United States,*
  111 Fed. Cl. 725 (2013) ..................................................... 19, 20

*Renne v. Geary,*
  501 U.S. 312 (1991) ................................................................... 9

*Reno v. Catholic Soc. Servs., Inc.,*
  509 U.S. 43 (1993) ................................................................... 25

*Reynolds v. Army & Air Force Exch. Serv.,*
  846 F.2d 746 (Fed. Cir. 1988) ........................................... 10, 13

*Richardson v. City & Cty. of Honolulu,*
  124 F.3d 1150 (9th Cir. 1997) ................................................ 25

*San Carlos Apache Tribe v. United States,*
  639 F.3d 1346 (Fed. Cir. 2011) ............................................... 13

*Shoshone Bannock Tribes v. Reno,*
  56 F.3d 1476 (D.C. Cir. 1995) .......................................................... 33, 34

*Shoshone Indian Tribe of the Wind River Reservation v. United States,*
  364 F.3d 1339 (Fed. Cir. 2004) ........................................... 13, 19, 20, 22

*Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States,*
  672 F.3d 1021 (Fed. Cir. 2012) .................................................................. 21

*Sioux Nation of Indians v. United States,*
  220 Ct. Cl. 442 (1979) ...................................................................................... 8

*Sioux Tribe of Indians v. United States,*
  105 Ct. Cl. 725 (1946) ...................................................................................... 7

*Sioux Tribe of Indians v. United States,*
  329 U.S. 685 (1946) .......................................................................................... 7

*Sioux Tribe of Indians v. United States,*
  8 Cl. Ct. 80 (1985) ............................................................................................. 8

*Sioux Tribe of Indians v. United States,*
  97 Ct. Cl. 391 (1942) ................................................................................... 6, 7

*Sioux Tribe of Indians v. United States,*
  97 Ct. Cl. 613 (1942) ................................................................................... 6, 7

*State College v. Ricks,*
  449 U.S. 250 (1980) ........................................................................................ 17

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ............................................................................................. 9

*Swift & Co. v. United States,*
  276 U.S. 311 (1928) ........................................................................................ 33

*United States v. Adair,*
  723 F.2d 1394 (9th Cir. 1983) ...................................................................... 11

*United States v. Batchelder,*
  442 U.S. 114 (1979) ........................................................................................ 33

*United States v. Jicarilla Apache Nation,*
  564 U.S. 162 (2011) ................................................................................. 28, 29

*United States v. Mitchell (Mitchell II),*
  463 U.S. 206 (1983) ............................................................................. 9, 27, 31

*United States v. Navajo Nation (Navajo I),*
  537 U.S. 488 (2003) ................................................................. 9, 27, 29, 30

*United States v. Navajo Nation (Navajo II),*
  556 U.S. 287 (2009) ......................................................... 9, 27, 28, 29, 30

*United States v. San Jacinto Tin Co.*,
125 U.S. 273 (1988) .................................................................................. 33

*United States v. Sioux Nation of Indians*,
207 Ct. Cl. 234 (1975) ............................................................................. 7, 8

*United States v. Testan*,
424 U.S. 392 (1976) ...................................................................................... 9

*United States v. White Mountain Apache Tribe*,
537 U.S. 465 (2003) .................................................................................. 27

*W. Shoshone Nat'l Council v. United States*,
73 Fed. Cl. 59 (2006) ...................................................................... 13, 14, 22

*Weeks Marine, Inc. v. United States*,
575 F.3d 1352 (Fed. Cir. 2009) ................................................................. 23

*Winters v. United States*,
207 U.S. 564 (1908) ....................................................................... 2, 4, 10, 12

*Wyandot Nation of Kansas v. United States*,
124 Fed. Cl. 601 (2016) ............................................................................. 20


Statutes

25 U.S.C. § 162a ............................................................................................. 28

25 U.S.C. § 162a(d)(8) ............................................................................... 2, 28

28 U.S.C. § 1362 ............................................................................................. 34

28 U.S.C. § 1491(a)(1) ................................................................................... 27

28 U.S.C. § 1491(a)(2) ................................................................................... 31

28 U.S.C. § 2501 ......................................................................................... 1, 12

28 U.S.C. § 516 ............................................................................................... 33

Act of Dec. 22, 1944, ch. 665, 58 Stat. 887 ............................................... 4, 14

Act of Feb. 28, 1877, ch. 72, 19 Stat. 254 ...................................................... 3

Act of June 28, 1938, ch. 795, 52 Stat. 1215 .................................................. 4

Act of Mar. 2, 1889, ch. 405, 25 Stat. 888 ................................................ 3, 4, 6

Act of Mar. 2, 1895, ch. 188, 28 Stat. 876 ...................................................... 6

Act of June 3, 1920, ch. 222, 41 Stat. 738 ...................................................... 6

Pub. L. No. 102-575 § 3002(9), 106 Stat. 4600 (1992) ............................... 29

Pub. L. No. 104-223 § 4, 110 Stat. 3026 (1996) ............................................. 8

Pub. L. No. 108-7, 117 Stat. 11,236 (2003) ........................................................... 19

Pub. L. No. 85-916, 72 Stat. 1766 (1958) ............................................................... 6

Pub. L. No. 87-735, 76 Stat. 704 (1962) ................................................................ 6

Treaty of Fort Laramie with Sioux, 1851, 11 Stat. 749 ......................................... 3

Treaty with the Sioux, 1868, 15 Stat. 635 ........................................................... 3, 4


Rules

RCFC 12(b) ................................................................................................. 11, 25, 26

RCFC 12(b)(1) ......................................................................................... 3, 22, 31, 35

RCFC 12(b)(7) .............................................................................................. 32

RCFC 14(b) .................................................................................................. 32

RCFC 19 ...................................................................................................... 32

RCFC 19(a)(1) ............................................................................................. 32


Regulations

55 Fed. Reg. 9223 (Mar. 12, 1990) .............................................................. 29


Other Authorities

H.R. Rep. No. 89-2040, at 2 (1966) ............................................................. 34

*Impact of the Flood Control Act of 1944 on Indian Tribes Along the Missouri River: Hearing Before the S. Comm. on Indian Affairs*, 110th Cong. 59 (2007) .............................................. 15

*The Sale of Water from the Upper Missouri River Basin by the Federal Government for the Development of Energy: Hearings Before the S. Subcomm. on Energy Research and Water Resources, Comm. on Interior and Insular Affairs*, 94th Cong. 386-90 (1975) ....................... 14

## LIST OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | Big Bend and Fort Randall Project Statistics, U.S. Army Corps of Engineers |
| B | Joint Stipulation of Settlement, *Crow Creek Sioux Tribe v. Salazar*, No. 04-CV-00900-TFH (D.D.C.), ECF No. 84 |
| C | Excerpts of *The Sale of Water from the Upper Missouri River Basin by the Federal Government for the Development of Energy: Hearings before the Senate Subcommittee on Energy Research and Water Resources, Committee on Interior and Insular Affairs*, 94th Cong. 387-90 (1975) |

# UNITED STATES' MOTION TO DISMISS

The United States of America moves to dismiss Plaintiff's Complaint (ECF No. 1) for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure and the Rules of the United States Court of Federal Claims ("RCFC").

First, the Court should dismiss all of Plaintiff's claims for lack of subject matter jurisdiction because the six-year statute of limitations, 28 U.S.C. § 2501, bars their consideration. Second, the Court should also dismiss all of Plaintiff's claims because Plaintiff has failed to establish Article III standing, or in the alternative, Plaintiff's claims are not ripe. Third, the Court should dismiss Count One for lack of subject matter jurisdiction because Plaintiff has not identified a source of law that imposes a money-mandating duty on the United States. Fourth, the Court should dismiss Count Three for lack of subject matter jurisdiction because the Court lacks general jurisdiction to provide equitable and declaratory relief. Finally, the Court should dismiss Counts One and Three for lack of subject matter jurisdiction because the Court lacks jurisdiction to issue the relief sought.

This motion is made upon the attached Memorandum in Support, the attached exhibits, and all pleadings, records, and other documents on file with the Court in this action, and upon such oral and/or documentary evidence as may be presented at, before, and after the hearing, if any, of this motion.

## MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION TO DISMISS

### I. INTRODUCTION

In *Winters v. United States*, the Supreme Court held that the establishment of an Indian reservation impliedly reserved the amount of water necessary to fulfill the purposes of the reservation.  207 U.S. 564, 576-77 (1908).  Federal reserved water rights give the United States the power to exclude others from subsequently diverting waters that feed the reservation. *Winters* doctrine rights are generally calculated based on present and future consumptive uses on a reservation, and may be used for any lawful purpose on the reservation.

The Complaint brought by Plaintiff Crow Creek Sioux Tribe rests on the novel and legally unsupportable theory that its *Winters* doctrine rights are "trust property and resources" within the meaning of 25 U.S.C. § 162a(d)(8), a statute addressing the Secretary of the Interior's responsibility with respect to the deposit of tribal trust funds in banks.  Plaintiff asserts that this statute and other authorities create money-mandating duties with respect to its *Winters* doctrine rights and for which the United States has a duty to protect and manage for Plaintiff's benefit. Compl., ECF No. 1.  Plaintiff claims that the authorization and construction of water infrastructure projects along the Missouri River in the mid-twentieth century resulted in a breach of the United States' fiduciary trust responsibilities as to Plaintiff's *Winters* doctrine rights. Compl. ¶¶ 50-60 (Count One), ECF No. 1.  Plaintiff also alleges a taking of Plaintiff's *Winters* doctrine rights without just compensation in violation of the Fifth Amendment.  *Id.* ¶¶ 61-65 (Count Two).  In addition to damages of at least $200 million, *id.* ¶ 7, Plaintiff demands declaratory and injunctive relief in the form of an accounting of its *Winters* doctrine rights.  *Id.* ¶¶ 66-73 (Count Three).

The Complaint suffers from a series of jurisdictional and pleading defects.  First, the Complaint is untimely and barred by the six-year statute of limitations.  Second, Plaintiff has failed to establish Article III standing for any of its claims because it cannot show an actual or imminent injury.  In the alternative, Plaintiff's claims are not ripe.  Third, the Court lacks jurisdiction over Count One because Plaintiff has not identified a money-mandating duty.  Fourth, the Court lacks jurisdiction over Count Three because the Court cannot order the declaratory relief of an accounting absent a money judgment.  Finally, Counts One and Three are not reviewable because the United States cannot be compelled to quantify and adjudicate Plaintiff's *Winters* doctrine rights.  For these reasons, the Court should dismiss the Complaint in its entirety under RCFC 12(b)(1).

## II.  **BACKGROUND**

### A.  **Factual Background**[1]

Plaintiff, a constituent of the Great Sioux Nation, is a federally-recognized Indian Tribe and signatory to the Fort Laramie Treaties of 1851 and 1868.  Compl. ¶ 9; Treaty of Fort Laramie with Sioux, 1851, 11 Stat. 749 ("Treaty of 1851"); Treaty with the Sioux, 1868, 15 Stat. 635 ("Treaty of 1868").  Plaintiff's reservation abuts the Missouri River.  Compl. ¶ 9.  After the discovery of gold in the Black Hills and renewed hostilities between the Sioux and white settlers, Congress acquired some of this territory from the Sioux.  Act of Feb. 28, 1877, ch. 72, 19 Stat. 254 ("Act of 1877").  Twelve years later, Congress divided the Great Sioux Nation into separate

---

[1] For purposes of this Rule 12 motion, the United States assumes that the allegations in the Complaint are true.  *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).  In the event the Court denies the motion and the case proceeds, the United States expects to challenge as necessary or appropriate Plaintiff's factual allegations.

reservations of described metes and bounds.  Compl. ¶ 14; Act of Mar. 2, 1889, ch. 405, 25 Stat. 888 ("Act of 1889"); *see* 25 Stat. 888, ch. 405 § 6 (delineating Crow Creek Sioux reservation).

The Treaties of 1851 and 1868 do not address Plaintiff's water rights, Compl. ¶ 14, but Articles VI and VIII of the 1868 Treaty sought to incentivize farming by providing land, seed, agricultural implements, and instruction to heads of families who wished to commence farming. 15 Stat. 635, arts. VI, VIII.  The Act of 1889 recognized both the importance of agriculture and the need to provide water for agricultural purposes.  25 Stat. 888, § 14.[2]

In 1938, Congress authorized a comprehensive plan for flood control and other purposes in the Missouri River Basin.  Act of June 28, 1938, ch. 795, 52 Stat. 1215, 1218.  But it was not until six years later that Congress gave the final authorization for the Missouri River Basin flood control project, which became known as the Pick-Sloan Plan.  Act of Dec. 22, 1944, ch. 665, 58 Stat. 887; Compl. ¶ 15.  The Pick-Sloan Plan includes five dams on the main stem of the Missouri River that provide flood control and hydroelectric power.  Compl. ¶ 15.  The two dams relevant to this litigation are Big Bend and Fort Randall, which together inundated approximately 15,000 acres of Plaintiff's reservation upon their completion.  *Id.*  Construction on Fort Randall Dam began in 1946 and was complete in 1952; the dam has been in operation since 1953.  Big Bend and Fort Randall Project Statistics at 3, attached hereto as Ex. A.  Construction on Big

---

[2] The section states:

> That in cases where the use of water for irrigation is necessary to render the lands within any Indian reservation created by this act available for agricultural purposes, the Secretary of the Interior be, and he is hereby, authorized to prescribe such rules and regulations as he may deem necessary to secure a just and equal distribution thereof among the Indians residing upon any such Indian reservation created by this act; and no other appropriation or grant of water by any riparian proprietor shall be authorized or permitted to the damage of any other riparian proprietor.

25 Stat. 888, § 14.

Bend Dam began in 1959 and was complete in 1963; the dam has been in operation since 1964. *Id.* at 1.  The following map shows the dams along the Missouri River and the location of Plaintiff's present-day reservation:



Plaintiff's present-day reservation encompasses approximately 125,591 acres and is headquartered in Fort Thompson, South Dakota.  Crow Creek Sioux Tribe, South Dakota Department of Tribal Relations, http://www.sdtribalrelations.com/crowcreek.aspx (last visited Oct. 25, 2016).

**B.  Procedural Background**

 The procedural history of Plaintiff's claims for compensation is convoluted.  Congress has repeatedly awarded Plaintiff compensation for claims arising out of the acts that reduced Plaintiff's reservation to its present-day boundaries.  The Act of 1889 included compensation for the 9,261,593 acres taken, which in 1942 was calculated at $5,307,656 for the Sioux Tribe as a whole.  *Sioux Tribe of Indians v. United States*, 97 Ct. Cl. 391, 397-98 (1942); *see* 25 Stat. at 898 § 22.  Congress appropriated an additional $187,039 in compensation (in 1895 dollars) to the Crow Creek Sioux.  Act of Mar. 2, 1895, ch. 188, 28 Stat. 876, 888.  In 1958, Congress authorized payment of $1,395,811.94 to Plaintiff "in settlement of all claims, rights, and demands of said tribe and its members arising out of the construction of the Fort Randall Dam and Reservoir project."  Act of Sept. 2, 1958, Pub. L. No. 85-916, 72 Stat. 1766; *see* Compl. ¶17.  For the Big Bend Dam and Reservoir project, Congress authorized payment of approximately $4.4 million for compensation and damages associated with the construction of the project.  Act of Oct. 3, 1962, Pub. L. No. 87-735, 76 Stat. 704.  The legislation also contained the recitation that it was in settlement of "all claims, rights, and demands of the tribe and individual Indians arising out of the taking under this Act,…."  *Id.*, § 1(a)(2); *see* Compl. ¶18.

 Congress also provided special jurisdiction for this Court to adjudicate Plaintiff's claims against the United States arising out of the Acts of 1877 and 1889.  Act of June 3, 1920, ch. 222, 41 Stat. 738 ("Special Jurisdictional Act of 1920").  In *Sioux Tribe of Indians v. United States*, the Tribes (which included Plaintiff) alleged that the Act of 1877 constituted a taking or misappropriation of their property because the Government had not obtained the consent of three-fourths of the adult male Indians as required by Article XII of the Treaty of 1868.  97 Ct.

Cl. 613, 657-58 (1942).  Although concurring in the facts as argued by the Tribes, the court

stated:

> if, under the circumstances disclosed by the record, Congress acted within the limits
> of its authority under the law and the treaty in acquiring the lands and hunting rights
> for which it made compensation, the plaintiff is not in our opinion entitled under
> the terms of the jurisdictional act to recover.

*Id.*  The court went on to decide that the Tribes had no claim under the terms of the Special

Jurisdictional Act of 1920 because there was no evidence that the 1877 Agreement was signed

under duress or that the United States had not paid the compensation it promised to pay.  *Id.* at

667-68.

In a second case, the Tribes sued for an accounting of the compensation paid for lands

ceded under the Acts of 1877 and 1889.  *Sioux Tribe of Indians*, 97 Ct. Cl. at 398.  The court

found that plaintiff's allegations of misappropriation were not ripe for decision and that the

United States was only accountable for the proceeds of the lands ceded under the Act of 1889.

*Id.* at 406.  The Tribes filed separate amended petitions, and the court found that the Crow Creek

Sioux Tribe was entitled to reimbursement of sums wrongfully disbursed from its trust funds.

*Sioux Tribe of Indians v. United States,* 105 Ct. Cl. 725, 775-76.  The Supreme Court vacated

and remanded this judgment to determine whether the Indian Claims Commission Act, 60 Stat.

1049, ch. 959 (1946), gave rise to any claims which might affect the judgment.  329 U.S. 685

(1946) (per curiam).

The Tribes then submitted their claims to the Indian Claims Commission ("ICC"),

alleging that the Act of 1877 constituted a taking for adjudication on the new standard of unfair

and dishonorable dealings.  *United States v. Sioux Nation of Indians*, 207 Ct. Cl. 234 (1975).

The Court of Claims reversed the ICC's finding of taking by eminent domain, finding that claim

to be *res judicata* under the previous litigation brought under the Special Jurisdictional Act of

1920.  *Id.* at 247.  However, the Court of Claims allowed the claim of taking by "dishonorable dealings," but held this claim did not support an award of interest.  *Id.* at 249.

Congressional involvement and litigation continued.  In 1978, Congress directed the Court of Claims to review the portion of the ICC's decision determining there had been a taking on the merits without regard to *res judicata* or collateral estoppel.  *Sioux Nation of Indians v. United States,* 220 Ct. Cl. 442, 447 (1979), *aff'd*, 448 U.S. 371 (1980).  The Court upheld the ICC's decision that the 1877 acquisition of the Black Hills and of rights-of-way across other Sioux lands were an unconstitutional taking for which just compensation had to be paid.  220 Ct. Cl. at 469.  Litigation continued concerning the amount of offsets, if any, the Government was entitled to take against the award of the value of the land.  *See generally Sioux Tribe of Indians v. United States*, 8 Cl. Ct. 80 (1985), *vacated by Cheyenne River Sioux Tribe v. United States*, 806 F.2d 1046 (Fed. Cir. 1986).

Plaintiff has continued to seek compensation before Congress and in this Court.  As the Complaint notes, Congress found that Plaintiff was entitled to additional benefits from the Pick-Sloan Project and authorized a payment of $27.5 million.  Compl. ¶ 20; *see* Crow Creek Sioux Tribe Infrastructure Development Trust Fund Act of 1996, Pub. L. No. 104-223 § 4, 110 Stat. 3026.  Plaintiff has sought to increase the amount paid under this Act.  Compl. ¶¶ 20, 22.  Most recently, Plaintiff received $14.5 million from the United States to settle Plaintiff's claims for an accounting and reconciliation of its trust fund account and non-monetary trust assets or resources.  Compl. ¶ 23; Joint Stipulation of Settlement, *Crow Creek Sioux Tribe v. Salazar*, No. 04-CV-00900-TFH (D.D.C. Aug. 8, 2012), ECF No. 84, attached hereto as Ex. B.

The instant Complaint is the latest in Plaintiff's request for compensation.  Specifically, Plaintiff alleges the United States: (1) breached its fiduciary duty to manage Plaintiff's *Winters*

doctrine rights, Compl. ¶¶ 50-60 (Count One); (2) took its *Winters* doctrine rights without just compensation in violation of the Fifth Amendment, Compl. ¶¶ 61-65 (Count Two); and (3) must adjudicate Plaintiff's *Winters* doctrine rights and provide an accounting.  Compl. ¶¶ 66-73 (Count Three).

## III.  LEGAL STANDARDS

### A.  Rule 12(b)(1)

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Navajo Nation* (*Navajo I*), 537 U.S. 488, 502 (2003) (quoting *United States v. Mitchell* (*Mitchell II*) 463 U.S. 206, 212 (1983)).  "Neither the Tucker Act nor the Indian Tucker Act creates substantive rights; they are simply jurisdictional provisions that operate to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts)." *United States v. Navajo Nation* (*Navajo II*), 556 U.S. 287, 290-91 (2009) (citing *United States v. Testan*, 424 U.S. 392, 400 (1976)).  Jurisdiction has to be established before the Court may proceed to the merits of a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998).  Courts are presumed to lack subject-matter jurisdiction unless it is affirmatively indicated by the record; therefore, it is plaintiffs' responsibility to allege facts sufficient to establish the Court's subject-matter jurisdiction.  *Renne v. Geary*, 501 U.S. 312, 316 (1991); *DaimlerChrysler Corp. v. United States*, 442 F.3d 1313, 1318 (Fed. Cir. 2006) ("[I]t is settled that a party invoking federal court jurisdiction must, in the initial pleading, allege sufficient facts to establish the court's jurisdiction." (citations omitted)).

Once the Court's subject-matter jurisdiction is questioned under Rule 12(b)(1), the Court accepts as true the factual allegations in the complaint and draws all reasonable inferences in a

plaintiff's favor. *Henke*, 60 F.3d at 797. However, a plaintiff bears the burden of proving by a preponderance of the evidence the facts sufficient to establish that the court possesses subject matter jurisdiction. *McNutt v. Gen. Motors Acceptance Corp.,* 298 U.S. 178, 189 (1936); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988); *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010).

The court may look also to evidence outside of the pleadings and inquire into jurisdictional facts to determine the existence of subject matter jurisdiction. *Land v. Dollar*, 330 U.S. 731, 735 & n.4 (1947); *Reynolds*, 846 F.2d at 747. In doing so, the court may examine relevant evidence to decide any factual disputes. *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999). If the defendant or the court questions jurisdiction, then a plaintiff cannot rely solely on factual allegations in the complaint but must bring forth relevant adequate proof to establish jurisdiction. *See McNutt*, 298 U.S. at 189.

## B. A *Winters* Doctrine Right Reserves Water Necessary to Fulfill the Purpose of the Reservation.

In *Winters v. United States*, the Supreme Court held that the establishment of an Indian reservation impliedly reserved the amount of water necessary to fulfill the purposes of the reservation. 207 U.S. at 576-77. In *Arizona v. California*, the Supreme Court subsequently relied on *Winters* to find that water from the Colorado River was "essential to the life of the Indian people" and thus the establishment of an Indian reservation included reserved water rights in the amount "necessary to make the reservation liveable." 373 U.S. 546, 559 (1963). Although agricultural use provided the basis for *Winters* doctrine rights, and diversions are generally calculated based on the consumptive use required for irrigation of the practicably irrigable acres of a reservation, *Winters* doctrine rights may be used for any lawful purpose on the reservation. *Arizona v. California*, 439 U.S. 419, 421-22 (1979) (per curium), *amended*, 466

U.S. 144 (1984); *see United States v. Adair*, 723 F.2d 1394, 1410 (9th Cir. 1983) (*Winters* doctrine rights are to "a quantity of the water flowing through the reservation not only for the purpose of supporting Klamath agriculture, but also for the purpose of maintaining the Tribe's treaty right to hunt and fish on reservation lands.").

A *Winters* doctrine right "gives the United States the power to exclude others from subsequently diverting waters that feed the reservation." *Hopi Tribe v. United States*, 782 F.3d 662, 667 (Fed. Cir. 2015). It does not give Plaintiff ownership of any particular molecules of water, either on the reservation or up- or downstream of the reservation. *John v. United States*, 720 F.3d 1214, 1225 (9th Cir. 2013) ("Since 1908, the courts have also recognized that a federal reservation of land carries with it the right to use water necessary to serve the purposes of federal reservations."); *John v. United States*, 247 F.3d 1032, 1041 (9th Cir. 2001) ("[T]he reserved rights doctrine vests in the United States only a usufructuary interest in water, not an ownership interest."); *see Niagara Mohawk Power Corp. v. Fed. Power Comm'n*, 202 F.2d 190, 198 (D.C. Cir. 1952) ("[T]he water rights in question do not rest upon a claim of ownership of the running waters of the Niagara. It is a usufructuary property right in the waters which is asserted—a vastly different thing, which was recognized at common law and has been confirmed by judicial decisions."), *aff'd*, 347 U.S. 239, 247 n.10 (1954) (noting "[n]either sovereign nor subject can acquire anything more than a mere usufructuary right" in a body of water); *accord Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1353-54 (Fed. Cir. 2013) (holding that "[u]nder well-established California law, 'the right of property in water is usufructuary, and consists not so much of the fluid itself as the advantage of its use'" (citation omitted)).

For purposes of this RCFC 12(b) motion, the United States assumes that Plaintiff actually has *Winters* doctrine rights—that is, the establishment of Plaintiff's reservation impliedly

reserved the right to use an amount of water necessary to fulfill the purposes of the reservation. *See* Compl. ¶ 12 (alleging that the "Supreme Court has held that the establishment of an Indian Reservation implies a right to sufficient unappropriated water to accomplish its purpose").  As the Complaint describes, *see id.*, Plaintiff's right is limited to the use of that amount of water necessary to accomplish the reservation's purposes.  *See Winters*, 207 U.S. at 575-77 (holding that a tribe's reserved rights consist of the use of enough water to accomplish the "purpose" of the tribe's reserved lands); *Arizona v. California*, 530 U.S. 392, 398 (holding that the quantity of water intended to be reserved for tribes is enough water to irrigate all the practicably irrigable acreage on the reservation), *supplemented* 531 U.S. 1 (2000); *Cappaert v. United States*, 426 U.S. 128, 141 (1976) ("The [reserved rights] doctrine, however, reserves only that amount of water necessary to fulfill the purpose of the reservation, no more.") (citation omitted); *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 47 (9th Cir. 1981) ("The specific purposes of an Indian reservation, however, were often unarticulated.  The general purpose, to provide a home for the Indians, is a broad one and must be liberally construed.").

Thus, for purposes of this motion, the Court should assume that Plaintiff has a right to use some presently undetermined amount of water necessary to fulfill the purposes of the reservation.  But Plaintiff does not own particular molecules of water in the Missouri River on, up-, or downstream of the reservation.  *John*, 720 F.3d at 1225; *Casitas*, 708 F.3d at 1353-54.

## IV.  ARGUMENT

### A.  The Six-Year Statute of Limitations, 28 U.S.C. § 2501, Bars Plaintiff's Claims.

All of the events that form the basis of the Complaint accrued more than six years ago. The Court therefore lacks jurisdiction over Counts One (alleged breach of fiduciary duty to manage *Winters* doctrine rights), Two (alleged Fifth Amendment taking of *Winters* doctrine

rights), and Three (claim for adjudication and accounting of *Winters* doctrine rights).  The Court should dismiss the Complaint in its entirety.

"The statute of limitations provision of 28 U.S.C. § 2501 places an express limit on the Government's waiver of sovereign immunity for every claim within the jurisdiction of the Court of Federal Claims."  *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339, 1346 (Fed. Cir. 2004) (citation omitted).  Because Plaintiff seeks to invoke this Court's jurisdiction, Plaintiff bears the burden of proving that its claims are timely by a preponderance of the evidence.  *See Fid. & Guar. Ins. Underwriters, Inc. v. United States*, 805 F.3d 1082, 1087 (Fed. Cir. 2015) (citing *Brandt v. United States*, 710 F.3d 1369, 1373 (Fed. Cir. 2013)); *Reynolds*, 846 F.2d at 748.

Plaintiff's claims accrue "when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence."  *San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1350 (Fed. Cir. 2011) (citation omitted); *Mitchell v. United States*, 13 Cl. Ct. 474, 477 (1987).  Because an objective standard applies, "a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue."  *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995) (citation omitted).  In addition, the fact that Plaintiff is the alleged beneficiary of a trust relationship does not itself impact the accrual date—Plaintiff must show either concealment by the defendant or show that the facts were unknowable in order to delay accrual of the limitations period.  *Menominee Tribe of Indians v. United States*, 726 F.2d 718, 721 (Fed. Cir. 1984); *W. Shoshone Nat'l Council v. United States*, 73 Fed. Cl. 59, 69 (2006), *aff'd*, 279 F. Appx. 980 (Fed. Cir. 2008).

1. <u>Plaintiff's Claims Accrued More than Six Years Before it Filed its Complaint.</u>

Plaintiff's claims accrued decades ago, more than six years before it filed its Complaint. As discussed *supra* in Part III.B, Plaintiff bases its claims on an alleged interference with its *Winters* doctrine rights. That resource is not hidden, and the facts about that resource were knowable, and known, to Plaintiff decades before it filed its Complaint. Plaintiff's claims arise from the United States' authorization of the Pick-Sloan Plan in 1944. *See* Compl. ¶ 15. Plaintiff complains that it was "not consulted prior to the enactment of Pick-Sloan," *Id.* ¶ 16, but that event occurred seventy-two years before Plaintiff filed its Complaint.

Plaintiff concedes that "it was not until 1949 that the BIA [Bureau of Indian Affairs] fully informed Plaintiff of the damage it would eventually suffer to Tribal lands." *Id.* ¶ 17. Thus, Plaintiff admits that it was "fully informed" of the damage "it would eventually suffer" sixty-seven years before it filed its Complaint. The two dams that Plaintiff believes resulted in its injury—the Big Bend and Fort Randall Dams—were authorized in 1944. 58 Stat. 887. Fort Randall Dam was constructed between 1946 and 1952 and Big Bend Dam between 1959 and 1963. Ex. A at 1, 3. They have been in operation since 1954 and 1964. *Id.* The passage of the Pick-Sloan Plan and the construction and operation of the two dams were obvious and plainly knowable. Any alleged breach of duty or taking of Plaintiff's *Winters* doctrine rights as a result of the dams was knowable, and known, to Plaintiff no later than the completion of these dams, fifty-three years before Plaintiff filed its Complaint.

Additional support for the untimeliness of the Complaint is found in Plaintiff's participation in two Senate hearings – one in 1975 and one in 2007 – where it articulated harms similar to those alleged in its Complaint. In August 1975, two members of the Tribe, including Plaintiff's Councilman Ray Leanna, provided testimony on a memorandum of understanding

between the Army Corps of Engineers and the Bureau of Reclamation to assume joint marketing authority of water from six Upper Missouri River stem reservoirs. *The Sale of Water from the Upper Missouri River Basin by the Federal Government for the Development of Energy: Hearings Before the S. Subcomm. on Energy Research and Water Resources, Comm. on Interior and Insular Affairs*, 94th Cong. 386-90 (1975) (statements by Joe Snyder & Ray Leanna), attached hereto as Ex. C. Plaintiff's councilman stated, "the tribe will not recognize water claims issued pursuant to the memorandum of understanding and will consider any tax or water use fee charged for regulation of water a direct tax on tribal resources. The tribe will resist this encroachment on our resources with whatever means are necessary." *Id.* at 389. Articulating a claim expressed in the instant Complaint, Plaintiff's councilman also asserted that "the Interior Department has willfully neglected its trust responsibility to protect Indian water rights." *Id.* at 388. Thirty-two years later, Plaintiff's tribal chairman participated in another Senate Hearing during which the Chairman of the Lower Brule Tribe, Michael Jandreau, explicitly articulated similar harms that Plaintiff now pursues in this case:

> The Army Corps of Engineers has estimated that the Pick-Sloan project's overall contribution to the U.S. economy is over $1.2 billion per year. Tribal compensation must be[] seen in that context. The United States took our best land and our water (under the *Winters* doctrine) to produce electricity. They then sell the electricity and instead of sharing the revenue with the Tribes, they charge us for the electricity.

*Impact of the Flood Control Act of 1944 on Indian Tribes Along the Missouri River: Hearing Before the S. Comm. on Indian Affairs*, 110th Cong. 59 (2007) (statement of Michael B. Jandreau, Chairman, Lower Brule Sioux Tribe). Chairman Jandreau's nine-year old statement is a blueprint for the claims Plaintiff now asserts in this action, and demonstrates that Plaintiff knew, or should have known, of the events that fix the government's alleged liability far more than six years before Plaintiff filed suit.

Plaintiff concedes that these events occurred decades before it filed its Complaint, but argues that it "was denied essential information necessary to be aware of the wrongs committed by Defendant."  Compl. ¶ 54; *see also id.* ¶ 55 (alleging that the "wrongs committed by Defendant . . . have been inherently unknowable to Plaintiff").  Plaintiff offers no support for the proposition that the alleged wrongs were "inherently unknowable," and the evidence discussed above plainly demonstrates the alleged injuries were knowable, and actually known, to Plaintiff more than six years before it filed suit.

The only support Plaintiff offers for its assertion that its claims were "inherently unknowable" is its assertion that "[t]o this day, Plaintiff's *Winters* doctrine rights have never been fixed, quantified or resolved."  Compl. ¶ 54.  But a quantification of Plaintiff's *Winters* doctrine rights is not necessary for Plaintiff to understand the United States built the Big Bend and Fort Randall Dams and has been using Missouri River water to operate those dams for five decades.  To the extent that Plaintiff can demonstrate that the construction of the dams has effected a Fifth Amendment taking of Plaintiff's *Winters* doctrine rights without just compensation, that claim accrued when the dams were constructed.  There is no basis to assume that a quantification of Plaintiff's *Winters* doctrine rights are necessary for Plaintiff's claim to accrue.[3]

2.  <u>The Continuing Claim Doctrine Does Not Toll the Six-Year Statute of Limitations.</u>

Although the events upon which Plaintiff bases its Complaint occurred decades ago, Plaintiff suggests it intends to argue that its claims are timely because the continuing claim doctrine tolled the statute of limitations.  *See* Compl. ¶¶ 56-57.  The Court should reject this

---

[3]  Of course, if a quantification of Plaintiff's *Winters* doctrine rights were necessary for Plaintiff's claims to accrue, there has been no such quantification and those claims must be determined to be unripe.  *See infra* Part IV.B.2.

argument.  In order for the continuing claims doctrine to apply, "the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages."  *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997); *Ariandne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998) ("[T]he continuing claims doctrine does not apply to a claim based on a single distinct event which has ill effects that continue to accumulate over time."); *see also Boling v. United States*, 220 F.3d 1365, 1373 (Fed. Cir. 2000) (same).  When considering the potential application of the continuing claims doctrine, the proper focus is upon the time of the wrongful acts, not when the consequences become most painful.  *See Del. State College v. Ricks*, 449 U.S. 250, 258 (1980).

The continuing claims doctrine does not apply here because Plaintiff's claims are not "inherently susceptible to being broken down into a series of independent and distinct events or wrongs."  *Brown Park Estates*, 127 F.3d at 1456.  The alleged wrongs here stem from the United States' construction and operation of two dams on the Missouri River.  Plaintiff's belief that the United States "continues to breach" its alleged fiduciary duty with respect to Plaintiff's *Winters* doctrine rights, Compl. ¶ 57, simply means the alleged effects of the federal actions are continuing, not that the United States took independent and distinct actions.

The cases cited in Paragraph 56 of the Complaint confirm the point.  In *Boling*, for example, the Federal Circuit rejected the continuing claim doctrine in a case alleging a violation of the Fifth Amendment due to property erosion because "each additional quantum of erosion damage is not a new breach by the government."  220 F.3d at 1374.  The fact that the government action at issue in *Boling* allegedly had long-term consequences (continued erosion) did not justify application of the continuing claim doctrine because the alleged harm stemmed

from a single government action (construction of a waterway). *See id.* The same result applies here, where a claimed long-term consequences (interference with a reserved water right) allegedly results from a single government action (construction and use of the two dams).[4]

The other case upon which Plaintiff relies—*Mitchell v. United States*, 10 Cl. Ct. 787 (1986)—also does not support application of the continuing claims doctrine. In that case, the Court of Claims considered two claims—(1) a regeneration claim, in which plaintiff alleged a failure to replant trees after each timber harvest, and (2) a stumpage claim, in which plaintiff alleged a failure to obtain fair market value for timber sold. *Id.* at 788-89. The court concluded that the continuing claims doctrine applied to the regeneration claim because the BIA's duty to replant trees after a timber harvest arose anew after each harvest—"the court views any ongoing breach of the continuing duty as creating a series of individual actionable wrongs." *Id.* at 788. But the continuing claim doctrine did not apply to the stumpage claim because the BIA's "duty to obtain adequate timber prices . . . arises at a specific point in time, namely when the timber is sold. The purported wrong occurs at that moment, and the subsequent failure to make plaintiffs whole is not a continuation of the original wrong, but merely a continuing effect of that wrong." *Id.* at 789.

The situation here is nothing like the regeneration claim in *Mitchell*, which the court concluded was inherently susceptible to being broken down into a series of wrongs—the "series of alleged regeneration wrongs arose not just as the cutting progressed from stand to stand, but also with respect to each individual tree." *Id.* at 788. The claims here are instead analogous to

---

[4] The same is true in *Felter v. Norton*, 412 F. Supp. 2d 118 (D.D.C. 2006), upon which Plaintiff also relies. *See* Compl. ¶ 56. That court concluded that "the continuing violations doctrine cannot apply to exempt plaintiffs from the statute of limitations period because plaintiffs fail to allege that defendants committed any wrongful acts during the limitations period prior to this action being filed." *Id.* at 126.

the stumpage claim in *Mitchell*:  Plaintiff here asserts a continued injury resulting from a single action, construction of the two dams and an alleged failure to compensate Plaintiff for its *Winters* doctrine rights.  Since Plaintiff's claim is not "inherently susceptible to being broken down into a series of independent and distinct events or wrongs," *Brown Park Estates*, 127 F.3d at 1456, the continuing claim doctrine does not apply.

> 3. The Department of the Interior Appropriation Act Riders Do Not Render Plaintiff's Breach of Trust Claim Timely.

Plaintiff may argue that its breach of trust claim is timely due to application of a rider included within a Department of the Interior Appropriations Act.  "Under the various Department of Interior Appropriations Act riders issued each year from 1990 to the present, claims for losses due to mismanagement of trust funds do not accrue until the affected tribe or individual Indian has been furnished with an accounting."  *Quapaw Tribe of Okla. v. United States*, 111 Fed. Cl. 725, 732 (2013); *see also Shoshone Indian Tribe of the Wind River Reservation*, 364 F.3d at 1344 n.2 (citing Pub. L. No. 101-512 (1990), Pub. L. No. 102-154 (1991), Pub. L. No. 103-138 (1993)).[5]  Statutes that toll, resurrect, or defer causes of action impact the United States' waiver of sovereign immunity and therefore "must be construed strictly and must clearly express the intent of Congress to permit a suit against the Government."

---

[5] For example, an Appropriations Act enacted in 2003 provided:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

Pub. L. No. 108-7, 117 Stat. 11, 236 (2003).

*Shoshone Indian Tribe of the Wind River Reservation*, 364 F.3d at 1344 (citing *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999)).

Plaintiff's breach of trust claim is not rendered timely by a Department of the Interior Appropriation Act for three independent reasons. First, Congress did not include a tolling provision in its Fiscal Year 2015 Appropriations Act, which applied from 1990 to 2014. *Wyandot Nation of Kansas v. United States*, 124 Fed. Cl. 601, 605-06 (2016), *appeal docketed* No. 16-1654 (Fed. Cir. Mar. 7, 2016). Thus, when Plaintiff filed its Complaint in 2016, there was no tolling provision upon which Plaintiff could rely.

Second, even if the tolling provisions were in effect in 2016, they would not apply to Plaintiff's claims because those provisions were limited to "claims for *losses due to mismanagement of trust funds*. . . ." *Quapaw Tribe*, 111 Fed. Cl. at 732 (emphasis added). In *Shoshone Indian Tribe of the Wind River Reservation*, the Federal Circuit interpreted the phrase "any claim . . . concerning losses to or mismanagement of trust funds" as applicable "only to claims for the mismanagement or loss of tribal funds that were actually collected and deposited into the tribal trusts by the Government." 364 F.3d at 1349. That is, the Appropriations Act rider "covers claims concerning 'losses to . . . trust *funds*' rather than losses to mineral trust *assets*." *Id.* at 1350. The Federal Circuit continued,

> [w]hile it is true that a failure to obtain a maximum benefit from a mineral asset is an example of an action that will result in a loss to the trust, the [Appropriation] Act's language does not on its face apply to claims involving trust *assets*. The Court of Federal Claims therefore erred in equating the mismanagement of trust *assets* with "losses to . . . trust *funds*.

*Id.*

Plaintiff bases its breach of trust claim here on an alleged mismanagement of the water right itself, not a mismanagement of a trust fund. *See* Compl. ¶ 58 (asserting a breach of trust as

a "failure to preserve *Plaintiff's reserved water rights*") (emphasis added); *id.* ¶ 59 (asserting a breach of trust due to failure "to protect, quantify, assert or record *Plaintiff's water rights, and instead continuously diverting, retaining, and appropriating that water to others and to Defendant's own use*") (emphasis added).  Plaintiff does not assert that the United States mismanaged some trust *fund*—it instead asserts that the United States has improperly used Plaintiff's *Winters* doctrine rights.  An accounting of some trust fund, therefore, would not provide Plaintiff any additional information, which might trigger some breach of trust claim.  Plaintiff's reliance on such a rider, therefore, would fail for the same reasons articulated in *Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States*: although a claim based on a "failure to collect royalties due under an *existing* contract or lease is a claim based upon losses to trust funds," and therefore within the scope of the Appropriations Act, a "claim based on a non-existing lease or contract is . . . outside the scope of the Interior Appropriation Act's tolling provision."  672 F.3d 1021, 1035 (Fed. Cir. 2012).  In this case, since Plaintiff alleges losses to, and mismanagement of, an asset, Plaintiff does not, and could not, point to any *existing* contract for which the United States allegedly failed to collect adequate royalties.  Thus, even if Congress had enacted a rider that extended to 2016, that legislation would not render Plaintiff's breach of trust claim timely.

Finally, Plaintiff previously waived, released, and promised not to litigate in any judicial forum any claims "that relate to Defendants' management or accounting of Plaintiff's trust funds or Plaintiff's non-monetary trust assets or resources."  Ex. B ¶ 4.  Plaintiff did not waive "claims for damages for loss of water resources allegedly caused by Defendants' failure to establish, acquire, enforce or protect such water rights" (*id.* ¶ 6(b), Compl. ¶ 23), but that claim concerns losses to or mismanagement of a trust asset, and is therefore not covered by any prior

Appropriations Act tolling provision.  Additionally, "the setting aside of the statute of limitations until an accounting is provided applies only to cases of trust fund mismanagement, not asset mismanagement."  *W. Shoshone Nat'l Council*, 73 Fed. Cl. at 70 (citing *Shoshone Indian Tribe of the Wind River Reservation*, 364 F.3d at 1350).  Since Plaintiff has already settled any claims concerning losses to or mismanagement of trust funds, Plaintiff cannot rely on any of the tolling provisions of an Appropriations Act.

In sum, all of Plaintiffs claims accrued more than six years ago.  The claims are barred by the statute of limitations and the Court should dismiss the Complaint in its entirety.

## B. Plaintiff Cannot Show Actual or Imminent Injury Stemming from Any Act of the United States.

Plaintiff's failure to establish Article III standing provides the Court with an additional basis to dismiss the Complaint in its entirety.

In Count One, Plaintiff alleges that the United States breached a fiduciary duty when it failed "to protect, quantify, assert or record Plaintiff's *Winters* doctrine rights, and instead continuously divert[ed], retain[ed], and appropriat[ed] that water to others and to Defendant's own use."  Compl. ¶ 59; *see id.* ¶ 51 (alleging a breach of trust based on the United States' alleged "failure to establish, acquire, enforce, manage, or protect Plaintiff's water and *Winters* reserved water rights").  Plaintiff further contends that the United States' use of Missouri River water for hydropower production and other purposes is a "continuing trespass," which it contends constitutes a breach of a fiduciary duty.  *See* Compl. ¶ 58-59.  In Count Two, Plaintiff alleges that these same actions—the "annual if not daily diversion, sale, conversion, retention and storage control over Plaintiff's waters, including the waters and natural flow of the Missouri River to which Plaintiff has prior and superior rights under the *Winters* Doctrine"—"amount to a Fifth Amendment taking of Plaintiff's water and water rights."  Compl. ¶ 64.  Count Three

demands injunctive and declaratory relief premised on these same government actions (or inactions).  *See* Compl. ¶¶ 66-73.

The Court should dismiss all three claims under RCFC 12(b)(1) because the complained-of actions have not interfered with, or appropriated, Plaintiff's *Winters* doctrine rights.  The absence of any injury demonstrates that Plaintiff lacks standing to pursue these claims.  Alternatively, Plaintiff's claims should be dismissed as unripe.

1. Plaintiff Lacks Standing to Pursue Its Claims.

"A plaintiff must have standing for a court to exercise jurisdiction over his or her claims." *Fredericks v. United States*, 125 Fed. Cl. 404, 412-13 (2016) (citing *Bannum, Inc. v. United States*, 115 Fed. Cl. 257, 269 (2014)).  To establish standing, a plaintiff must satisfy three elements.  First, a plaintiff "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).  Second, plaintiff's injury must be traceable to the defendant's actions.  *Id.*  Third, "it must be likely, as opposed to merely speculative that the injury will be redressed by a favorable decision."  *Id.* at 561.  "The Court of Federal Claims, though an Article I court . . . applies the same standing requirements enforced by other federal courts created under Article III."  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358-59 (Fed. Cir. 2009) (quoting *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003)).

We assume for purposes of this motion that Plaintiff has *Winters* doctrine rights.  *See supra* Part III.B.  That means, at least for purposes of this motion, Plaintiff has a vested right to use an undetermined amount of water to the extent, and in the manner, necessary to fulfill the purposes of the reservation.  *See id.*  Plaintiff lacks standing to pursue its claims, first, because

Plaintiff has not alleged—and could not allege—that it has suffered an injury in fact.  Plaintiff's

water right remains intact and the United States' use of Missouri River water has altered or

diminished Plaintiff's right to use that quantity of water necessary to fulfill the purposes of the

reservation.  Even assuming that the Missouri River will ultimately be the primary or sole source

identified to satisfy Plaintiff's *Winters* doctrine rights (which may well be the case), the

Complaint does not allege that Missouri River flows have historically been insufficient, are

presently insufficient, or may someday become insufficient to meet the reservation's purposes.

The Complaint does not allege that the United States has ever limited or denied Plaintiff's

request to divert or use Missouri River water – nor has the United States ever done so.  In fact,

Plaintiff does not even allege that it has ever attempted to divert or use water from the Missouri

River.  Plaintiff's failure to allege, much less show, that it has been denied a request to divert or

use water, means Plaintiff failed to show a concrete and particularized, as well as actual or

imminent injury to their *Winters* doctrine rights.[6]

        The injuries Plaintiff identifies in its Complaint are purely speculative and premised on a

fundamental misapprehension of its *Winters* doctrine rights.  In its discussion of the alleged

"breaches, acts and omission[s]" leading to the filing of its Complaint, Plaintiff identifies the

following alleged violations: (1) failure to provide an historical accounting; (2) failure to obtain

an appropriate return on Plaintiff's water right; (3) failure to record or collect payments for the

use of Plaintiff's water right; (4) failure to preserve Plaintiff's water right; and (5) allowing

others to use Plaintiff's water right.  Compl. ¶ 33.  But each of these alleged actions or omissions

could be considered an injury only if Plaintiff's water right is the equivalent of ownership of

---

[6] Even if Plaintiff did make such allegations, they are not actionable in this Court as a claim for
money damages.  *See infra* Part IV.C.

particular molecules of water.  Since Plaintiff owns only a right to use water needed to fulfill the purposes of its reservation, these alleged harms are illusory.

Second, since Plaintiff fails to allege, much less show, a limitation or denial of its right to divert or use Missouri River water, Plaintiff cannot demonstrate that its alleged injury is "fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560.  Third, because Plaintiff's alleged injuries are untethered to the water right Plaintiff claims, it is merely speculative that the alleged injury will be redressed by a favorable decision.  *Id.* at 561.  Plaintiff therefore lacks standing to pursue these claims, and the Complaint should be dismissed pursuant to RCFC 12(b).

2. <u>Alternatively, Plaintiff's Claims are Not Ripe.</u>

The "Court of Federal Claims must address ripeness as a 'threshold consideration[]' before addressing the merits." *Casitas*, 708 F.3d at 1352 (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2001)).  "The ripeness doctrine is drawn from both Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 57, n. 18 (1993)).  The constitutional requirement of ripeness shares the constitutional requirement of standing that an injury in fact be actual or certainly impending.  *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (Fed. Cir. 1996).  "The central concern of the ripeness inquiry is whether the case involves uncertain or contingent future events that may not occur as anticipated or indeed may not occur at all." *Richardson v. City & Cty. of Honolulu*, 124 F.3d 1150, 1160 (9th Cir. 1997).[7]  The Court of Federal Claims applies the

---

[7]  The purpose of the ripeness requirement is:

> to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to

same ripeness principles that apply to Article III court. *See, e.g., Casitas*, 708 F.3d at 1360

(dismissing claimed taking of water right as unripe).

Plaintiff's claims are not ripe for the same reason Plaintiff lacks standing to pursue these

claims: the Complaint does not allege (and Plaintiff cannot show) that the United States has

taken some action that limits or prevents Plaintiff from fully exercising its unadjudicated *Winters*

doctrine rights. *Accord Casitas*, 708 F.3d at 1360 (dismissing plaintiff's Fifth Amendment claim

as unripe because "the diversion of water down the fish ladder to date has not impinged on

Casitas's compensable property interest—the right to beneficial use. If and when Casitas has

sufficient evidence to file a complaint alleging a compensable injury, Casitas's takings claims

will have accrued."). Because Plaintiff fails to identify, and cannot identify, any injury in fact,

Plaintiff's claims are not ripe and should be dismissed pursuant to RCFC 12(b).

**C. The Court Lacks Jurisdiction over Plaintiff's Breach of Trust Claim Because There Is No Money-Mandating Fiduciary Duty to Manage Missouri River Water.**

The Court should dismiss the Complaint in its entirety for the reasons stated in the

foregoing sections. Should the Court conclude that Count One survives, that count should be

dismissed because it suffers from the additional jurisdictional defect that Plaintiff has not

identified a source of law imposing a money-mandating duty on the United States to manage

Plaintiff's *Winters* doctrine rights.

---

protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977). Dismissal serves this important policy rationale. Even if Plaintiff believes that the United States will someday prevent Plaintiff from using its *Winters* doctrine rights—an allegation that is not even present in the Complaint—the Court should decline to entangle itself in that "abstract disagreements over administrative policies." *Id.* at 148.

The United States cannot be sued without its consent. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "The terms of consent to be sued may not be inferred, but must be unequivocally expressed." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (internal quotation marks and citation omitted). The Tucker Act is one such waiver of sovereign immunity, which gives the Court of Federal Claims jurisdiction to award damages upon proof of "any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Indian Tucker Act "confers a like waiver for Indian tribal claims that 'otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe.'" *White Mountain Apache Tribe*, 537 U.S. at 472 (citing 28 U.S.C. § 1505). Neither the Tucker Act nor the Indian Tucker Act creates a substantive right enforceable against the United States for money damages. *Id.* (citation omitted).

Before a tribal plaintiff can invoke jurisdiction under the Indian Tucker Act, it must clear two hurdles. *Navajo II*, 556 U.S. at 290. First, "a Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Navajo I*, 537 U.S. at 506 (citing *Mitchell II*, 463 U.S. at 216-217, 219). "[A] statute or regulation that recites a general trust relationship between the United States and the Indian People is not enough to establish any particular trust duty." *Hopi*, 782 F.3d at 667 (citation omitted). Second, if a tribe identifies a substantive source of law, "the court must then determine whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].'" *Navajo I*, 537 U.S. at 506 (citing *Mitchell II*, 463 U.S. at 219).

"*If* a plaintiff identifies such a prescription, and *if* that prescription bears the hallmarks of a conventional fiduciary relationship, *then* trust principles (including any such principles premised on control) could play a role in inferring that the trust obligation is enforceable by damages." *Navajo II*, 556 U.S. at 301 (internal citations and alterations omitted).

Here, Plaintiff alleges the Tribe is entitled to monetary damages as a result of the government's breach of fiduciary duty set forth in 25 U.S.C. § 162a(d)(8).  *See* Compl. ¶ 7, ¶¶ 28-49 ("Substantive Law Mandating Compensation"), ¶¶ 52, 57.  The statute states:

> (d)     Trust responsibilities of Secretary of the Interior
>
> The Secretary's proper discharge of the trust responsibilities of the United States shall include (but are not limited to) the following:
> . . .
> (8)     Appropriately managing the natural resources located within the boundaries of Indian reservations and trust lands.

25 U.S.C. § 162a(d)(8).  This statute does not create *specific* "rights creating or duty-imposing" prescriptions for managing Plaintiff's *Winters* doctrine rights.  Rather, the statute concerns the Secretary's responsibility with respect to the appropriate management and investment of Indian trust funds, and the expenditure of moneys collected from irrigation projects.  *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 178 (2011) ("These provisions [including 25 U.S.C. § 162a] define the trust responsibilities of the United States with respect to tribal funds." (internal quotation marks and citation omitted); *Hopi*, 782 F.3d at 670 n.1 (stating that 25 U.S.C. § 162a(d)(8) "detail[s] the United States' trust responsibilities in managing tribal funds and investments.").  Plaintiff's statement that the Court should liberally construe Section 162a(d)(8) because there is "no basis or authority" to limit it to the management of tribal money, Compl. ¶ 37, is wrong and directly contradicted by controlling precedent.  The statute explicitly concerns the management of trust funds and does not provide the substantive source of law necessary for

this Court to invoke jurisdiction over Count One.  *Navajo I*, 537 U.S. at 506; *Hopi*, 782 F.3d at 667.

      To the extent that Plaintiff relies on general fiduciary duties in Section 162a(d)(8) or other sources cited in its Complaint to argue this Court has jurisdiction over Count One, none are substantive sources of law that establish *specific* fiduciary duties.[8]  In *Jicarilla*, the Supreme Court made it clear that "[t]he Government assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities *by statute*," and also that "[w]hen the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated, neither the Government's control over Indian assets *nor common-law trust principles matter*."  564 U.S. at 177 (quoting *Navajo II*, 556 U.S. at 302) (emphasis added); *accord Menominee Indian Tribe of Wisc. v. United States*, 136 S. Ct. 750, 757 (2015) ("We do not question the 'general trust relationship between the United States and the Indian tribes,' but any specific obligations the Government may have under that relationship are 'governed by statutes rather than the common law.'") (quoting *Jicarilla*, 564 U.S. at 173-72).  Common law principles may not be the sole basis for creating an enforceable trust obligation.  *Hopi*, 782 F.3d at 668 ("common-law trust duties standing alone, including those premised on control, are not enough to establish a particular fiduciary duty of the United States."); *Gros Ventre Tribe v. United States*, 469 F.3d 801, 810 (9th Cir. 2006) ("the Tribes cannot allege a common law cause of action for breach of trust that is wholly separate from any statutorily granted right"); *see also*

_____

[8] *See* Compl. ¶ 10 (general fiduciary duty the United States bears as a trustee), ¶¶ 13-14 (Treaties of 1851 and 1868), ¶14 (Act of 1889), ¶ 32 (Working Group in Indian Water Settlements; Criteria and Procedures for the Participation of the Federal Government in Negotiations for the Settlement of Indian Water Rights Claims, 55 Fed. Reg. 9223 (Mar. 12, 1990), and the Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. No. 102-575, §3002(9), 106 Stat. 4600, 4694).

*Navajo Nation v. U.S. Dep't of the Interior*, 34 F. Supp. 3d 1019, 1029 (D. Ariz. 2014), *appeal docketed* No. 14-16864 (9th Cir. Sept. 26, 2014) (finding that plaintiff failed to identify a relevant, specific duty to support its breach of trust claim).

Simply put, Plaintiff has failed to plead or otherwise identify any positive law (treaty, statute, executive order, or otherwise) that imposes a specific fiduciary duty on the United States to take certain actions regarding its *Winters* doctrine rights on the Missouri River, something it must do to assert a legally cognizable claim for breach of a fiduciary duty.  *Navajo II*, 556 U.S. at 302; *Navajo I*, 537 U.S. at 506.  Plaintiff's failure to identify specific, substantive source of law should end the Court's inquiry into whether there is a money-mandating duty, and the Court should find that it lacks jurisdiction over Count One.

But even if Plaintiff had identified a substantive source of law establishing specific fiduciary duties as required by *Navajo I* and *Navajo II*, Plaintiff cannot clear the second hurdle to subject matter jurisdiction for Count One, which requires the relevant source of substantive law to be 'fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].'"  *Navajo I*, 537 U.S. at 506.  In this context, common law principles, such as the degree of control exercised by the United States over the resource may be considered.  *Navajo II*, 556 U.S. at 301.

The Complaint does not cite a single statute or regulation prescribing "detailed fiduciary responsibilities" involving "a comprehensive managerial role" for the federal government concerning the Tribe's exercise of its *Winters* doctrine rights, much less "expressly invest[ing the United States with] responsibility to secure the needs and best interests of the Indian owner and his heirs" in the Tribe's *Winters* doctrine rights.  *Navajo I*, 537 U.S. at 507-08.  There is certainly no statutory or regulatory scheme analogous to the timber statutes in *Mitchell II* requiring the

United States to manage Plaintiff's *Winters* doctrine rights.  *See Mitchell II*, 463 U.S. at 222.

The Tribe has failed to show money-mandating duties enforceable in damages, or even the type

of pervasive control which would lead to the inference that such duties exist.

Plaintiff has not identified a basis for a money-mandating fiduciary duty for the

management of Missouri River water.  Plaintiff therefore has not met its burden to show this

Court has jurisdiction over Count One.

## D.  <u>The Court Lacks Jurisdiction over Plaintiff's Accounting Claim.</u>

In Count Three, Plaintiff demands that the Court require "Defendant to establish and

measure the reserved water rights held by Plaintiff; to quantify the reserved water rights held by

Plaintiff; to assert water rights on behalf of Plaintiff; and to record legal title to water held in

trust for the benefit of Plaintiff."  Compl. ¶ 67.  Plaintiff also demands an "accurate accounting"

of Plaintiff's *Winters* doctrine rights and additional declaratory relief associated with the

accounting of those rights.  *Id.* ¶ 68.  The Court should dismiss Count Three for lack of

jurisdiction pursuant to RCFC 12(b)(1).

This Court lacks general jurisdiction to provide declaratory and injunctive relief.  *See*

*Evans v. United States*, 107 Fed. Cl. 442, 451-52 (2012).  Instead, this Court's ability to award

equitable relief is limited to those circumstances when such relief is "incident of and collateral

to" a money judgment.  28 U.S.C. § 1491(a)(2).  Only if liability were established could the

Court hear evidence to aid in judgment to assess damages, including ordering an accounting.  *See*

*Muscogee (Creek) Nation of Okla. v. United States*, 103 Fed. Cl. 210, 218 (2011).  Count Three

seeks a standalone accounting of Plaintiff's *Winters* doctrine rights and the revenue allegedly

collected therefrom.  This Court lacks jurisdiction over such a claim.  *See Am. Indians Residing*

*on the Maricopa-Ak Chin Reservation v. United States*, 667 F.2d 980, 983 (Ct. Cl. 1981) (per

curiam) ("Unlike the Indian Claims Commission, this court has no equity jurisdiction to entertain a suit for an accounting except in aid of a judgment of liability against the Government." (citation omitted)); *Klamath & Modoc Tribes v. United States*, 174 Ct. Cl. 483, 491 (1966) ("To require the Government *ab initio* to render a general accounting on the basis of unproved allegations and before its liability is determined would convert this proceeding from a suit for money damages to an independent equitable action for a general accounting.").[9]

**E.  The Court Lacks Jurisdiction over Plaintiff's Breach and Accounting Claims Because the United States Cannot Be Compelled to Quantify Water Rights.**

Count One asserts the United States breached its trust obligation because the United States "fail[ed] to establish, acquire, enforce, manage, or protect Plaintiff's water and *Winters* reserved water rights." Compl. ¶ 51. Count Three asserts an entitlement to "declaratory and injunctive relief including judgment requiring [the United States] to establish and measure the reserved water rights held by Plaintiff; to quantify the reserved water rights held by Plaintiff; to assert water rights on behalf of Plaintiff; and to record legal title to water held in trust for the benefit of Plaintiff." Compl. ¶ 67. To the extent that these allegations can be interpreted as a contention that the United States is in breach of trust because it failed to institute *judicial*

---

[9] Even if the Court found that it had jurisdiction over Count Three, it must be dismissed under RCFC 12(b)(7) for failure to join a party under RCFC 19. Plaintiff's *Winters* doctrine rights co-exist among the water rights of many other users who divert and use Missouri River water – including individuals, business, governments, Tribes, and other entities. Those other water users are required parties under Rule 19 since the Court "cannot accord complete relief among existing parties" and because those other water users' rights relate "to the subject of the action and [are] so situated that disposing of the action in [their] absence" would "impair or impede [them the] ability to protect the interest." RCFC 19(a)(1); *see also California v. United States*, 235 F.2d 647, 663 (9th Cir. 1956) ("The only proper method of adjudicating the rights on a stream, whether riparian or appropriative  or mixed, is to have all owners of land on the watershed and all appropriators who use water from the streams involved in another watershed in court at the same time."); *see* RCFC 14(b) (requiring notice to a third party who may have an interest in the subject matter of the suit).

proceedings to quantify through an adjudication of Plaintiff's *Winters* doctrine rights, such claims must be dismissed for lack of subject matter jurisdiction.  The appropriate way for Plaintiff to obtain this relief is through an administrative adjudication or a congressionally approved settlement – not a federal lawsuit.

Conduct of litigation on behalf of the United States "is reserved to officers of the Department of Justice, under the direction of the Attorney General."  28 U.S.C. § 516.  The Supreme Court has "recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (citing *United States v. Batchelder*, 442 U.S. 114, 123-24 (1979)).  It is well established that the commencement and conduct of litigation by the Attorney General traditionally has been regarded as being committed to that officer's discretion.  *See, e.g.*, *Swift & Co. v. United States*, 276 U.S. 311, 331-32 (1928); *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 279 (1988); *see also Creek Nation v. United States*, 318 U.S. 629, 639 (1943) (discussing the Secretary of the Interior's discretion to handle Indian affairs).  This is also true in the particular context of whether the United States has a duty to file water rights claims on behalf of Indian Tribes. *Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476, 1481 (D.C. Cir. 1995).

In asserting a mandatory duty to commence litigation to quantify Plaintiff's water rights to the Missouri River, Plaintiff has disregarded the plain language of 28 U.S.C. § 516 and controlling precedent reserving the adjudication of water rights to the discretion of the Attorney General.  By filing its breach of trust claim, Plaintiff seeks, through the judicial process, to divest the Attorney General of her legal prerogative whether to devote the litigation resources of the federal government to adjudicate Plaintiff's potential claim to Missouri River water.  Such

matters are committed to the discretion of the Attorney General by law, and are thus judicially

unreviewable.  *Heckler*, 470 U.S. at 831; *Shoshone-Bannock Tribes*, 56 F.3d at 1483.

While the Tribe may disagree as to whether particular claims should be litigated, that

disagreement does not mean that the Tribe, through this lawsuit, can legally divest the Attorney

General of her prerogatives.  *See Shoshone-Bannock Tribes*, 56 F.3d at 1483.  In *Shoshone-*

*Bannock Tribes*, the Tribes brought suit seeking a declaration that the United States had breached

its trust responsibilities by refusing to file certain claims in a pending general stream

adjudication. The United States countered that the claims were without merit and that no specific

treaty, statute, or agreement obligated the Attorney General to bring them.  *Id.* at 1479-80.  The

court dismissed for lack of jurisdiction, finding nothing in any federal statute that would limit the

litigating discretion of the Attorney General.  *Id.* at 1481.  The court acknowledged that "the

United States acts in a fiduciary capacity in its dealings with Indian tribal property," but held that

"an Indian tribe cannot force the government to take a specific action unless a treaty, statute or

agreement imposes, expressly or by implication, that duty."  *Id.* at 1482.

Furthermore, Plaintiff has no need to compel or coerce the United States to quantify

Plaintiff's *Winters* doctrine rights.  Congress enacted  28 U.S.C. § 1362 specifically to grant

Indian Tribes access to federal courts when the United States is unable or unwilling to

commence litigation on behalf of a Tribe.  In the House Report accompanying 28 U.S.C § 1362,

Congress stated:

> [t]he enactment of this bill would provide for U.S. district court jurisdiction in those
> cases where the U.S. attorney declines to bring an action and the tribe elects to bring
> the action.  As is observed in the Department of the Interior report, the tribes would
> then have access to the Federal courts through their own attorneys.

H.R. REP. NO. 89-2040, at 2 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3145, 3147.  The Supreme

Court has already confirmed that Tribes such as Plaintiff may rely on as 28 U.S.C § 1362 to

pursue water rights claims on their own behalf. *Arizona v. San Carlos Apache Tribe of Ariz.*, 463 U.S. 545, 559 n.10 (1983).

Plaintiff's effort to judicially compel the United States to quantify and adjudicate Plaintiff's alleged rights to Missouri River is not reviewable in this Court and must be dismissed pursuant to RCFC 12(b)(1).

## V.  **CONCLUSION**

For the foregoing reasons, the Court should grant Defendant's motion to dismiss the Complaint pursuant to RCFC 12(b)(1).


Dated: October 27, 2016


                              Respectfully submitted,

                              JOHN C. CRUDEN
                              Assistant Attorney General
                              Environment & Natural Resources Division

                              */s/  John P. Tustin*
                              JOHN P. TUSTIN
                              Environment & Natural Resources Division
                              United States Department of Justice
                              601 D Street, NW, Rm. 3538
                              Washington, D.C. 20004
                              202-305-3022
                              john.tustin@usdoj.gov

                              *Counsel for Defendant*